UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TRUSTEES OF THE PAVERS AND ROAD BUILDERS DISTRICT COUNCIL WELFARE, PENSION, AND ANNUITY FUNDS, and THE TRUSTEES OF THE LOCAL 1010 APPRENTICESHIP, SKILL, IMPROVEMENT, AND TRAINING FUND,

*Plaintiffs*,

– against –

TRI-STATE PAVING, LLC,

*Defendant*.

**MEMORANDUM & ORDER**
24-cv-03236 (NCM) (SDE)

**NATASHA C. MERLE**, United States District Judge:

Plaintiffs, Trustees of the Pavers and Road Builders District Council Welfare, Pension, and Annuity Funds and the Trustees of the Local 1010 Apprenticeship, Skill, Improvement, and Training Fund (collectively the "Funds" or plaintiffs), are multiemployer benefit plans within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"). The Funds bring this action against Tri-State Paving, LLC under Sections 502(a)(3) and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3), 1145, and Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, to collect all unpaid benefit fund contributions, interest, liquidated damages, dues check-offs, union assessments, attorneys' fees and costs, audit costs, and post-judgment interest. *See generally* Am. Compl. ("AC"), ECF No. 15. Before the Court is plaintiffs' motion for

summary judgment. *See generally* Mot.[1] For the reasons set forth below, plaintiffs' motion is **GRANTED in part**, **DENIED in part**.

**BACKGROUND**

Plaintiffs are trustees of multiemployer labor-management trust funds.[2] Pls.' 56.1 Statement ("56.1") ¶ 1, ECF No. 32-1; Def.'s Counter 56.1 Statement ("Counter 56.1") ¶ 1, ECF No. 33-1.[3] The Funds constitute employee benefit plans, and their purpose is to collect contributions remitted by employers pursuant to a collective bargaining agreement with the Highway Road and Street Construction Laborers Local 1010 ("Union"). Counter 56.1 ¶ 1. Defendant is an employer engaged in the construction business and is bound by a collective bargaining agreement with the Union. *See* Counter 56.1 ¶ 7.

---

[1] The Court hereinafter refers to plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment, ECF No. 32, as the "Motion"; defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, ECF No. 33, as the "Opposition"; and plaintiffs' Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Summary Judgment, ECF No. 34, as the "Reply."

[2] The following facts, drawn from the parties' Local Civil Rule 56.1 Statements and evidentiary submissions, are undisputed unless otherwise noted.

[3] Both plaintiffs' 56.1 Statement and defendant's responses in its Counter 56.1 Statement are without citations to admissible evidence in violation of the Local Rules of the Eastern District of New York. *See* 56.1 ¶¶ 36, 40, 47; Counter 56.1 ¶¶ 9, 38–39, 46; Loc. Civ. R. 56.1(d) ("Each statement by the movant or opponent under Rule 56.1(a) and (b), including each statement denying and controverting any statement of material fact, must be followed by citation to evidence that would be admissible and set forth as required by Fed. R. Civ. P. 56(c)."). Thus, any of plaintiffs' assertions that are not supported by citations to the record will be disregarded. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). To the extent that defendant "has offered no admissible evidence to refute" a particular fact in plaintiffs' 56.1 statement, "that fact is deemed admitted." *Brown v. City of New York*, No. 11-cv-01068, 2013 WL 491926, at *1 n.1 (S.D.N.Y. Feb. 8, 2013).

## I. The Collective Bargaining Agreement

On August 17, 2022, defendant signed a collective bargaining agreement with the Union. Counter 56.1 ¶ 7; *see* Loscalzo Decl. Ex. A, Collective Bargaining Agreement ("CBA"), ECF No. 32-3. The CBA covers work related to:

> all Site and Grounds Improvement, including but not limited to Utility, Paving, Highway, Road and Street Construction Work ("Work") on highways, bridges, roads, streets, avenues, alleys, aprons, airports, runways, taxiways, sewer treatment plants, bus depots, parking lots (including shoulders and malls there), parks, plazas, malls, housing projects, playgrounds, schools, athletic fields and all other sites, and incidental work thereto.

CBA art. VI § 1. The CBA's provisions list numerous worker duties covered by its terms. *See* CBA art. VI § 1 ¶¶ 1–28. The CBA also lists covered job classifications including: foreman, formsetter, laborer, seal coater, paving stone, installer, construction, fence installer, screed person/micro paver, raker, shoveler, small equipment operator, striping machine operator, lineperson and operator, striping flaggers and traffic safety, and repair and maintenance. CBA art. VII § 8, art. XIV § 7. There are two types of foremen enumerated in the contract, those that are on "production paving" and those that are not. CBA art. VII § 8.

Defendant is required to make contributions to the Funds on behalf of workers covered by the CBA. CBA art. IX § 1(b). The CBA requires defendant to also pay union assessments and dues check-offs calculated based on the number of hours of covered work performed by each employee multiplied by the applicable rate. Counter 56.1 ¶ 12. The applicable rate is periodically updated on a schedule set forth in the CBA. Counter 56.1 ¶ 12.

The final page of the CBA states at the top:

> **<u>INDEPENDENT AGREEMENT</u>**
> LABORERS LOCAL UNION 1010
> July 1, 2021 through June 30, 2024

CBA 41. Immediately below, the CBA states:

> IN WITNESS WHEREOF, the parties hereto have hereunder signed this Agreement by their duly authorized representatives, effective as of the day and year above written.

This page is signed by representatives from Tri-State Paving and the Union, and is dated August 17, 2022. CBA 41.[4]

Also on August 17, 2022, defendant and the Union executed a side letter to the CBA. Counter 56.1 ¶ 8; *see* Loscalzo Decl. Ex. B ("Side Letter"), ECF No. 32-4. The Side Letter is captioned: "Side Letter to the Independent Collective Bargaining Agreement Between Laborers' Local Union 1010 and Tri-State Paving LLC for the period of July 1, 2021 through June 30, 2024." Side Letter 1. The Side Letter was executed by the same representative of Tri-State Paving who signed the CBA. *See* CBA 41; Side Letter 1. The purpose of the Side Letter is to "modify . . . the terms and conditions of employment of those employees . . . performing work covered by the July 1, 2021–June 30, 2024 [CBA]." The Side Letter specifically modified the work covered under the CBA by "exclud[ing] all work performed by employees . . . that is not funded in whole or in part by any City, State or Federal municipality and/or agency." Side Letter 1. The CBA controls all other terms not modified by the Side Letter. *See* Side Letter 1.

The Funds are maintained pursuant to "Agreements and Declarations of Trust" ("Trust Agreement"). Counter 56.1 ¶ 15. The CBA binds defendant to the Trust Agreement,

---

4 Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

and the Trust Agreement is "made part of [the CBA] and incorporated" into the CBA. Counter 56.1 ¶¶ 15, 18. Pursuant to the Trust Agreement, delinquent contributions are subject to the Policy for the Collection of Delinquent Fringe Benefit Contributions ("Collection Policy"). Counter 56.1 ¶ 17.

The Collection Policy and the CBA provide contributions and corresponding remittance reports detailing the number of hours of covered work performed by its employees are due no later than 35 days after the end of the month during which the hours were worked. Counter 56.1 ¶ 19; *see* CBA art. IX § 1(b). For example, "October 2021 contributions [are] due on December 5, 2021 (October 31, 2021, plus 35 days)." Morris Decl. ¶ 15, ECF No. 32-19. The CBA provides that the Funds may periodically conduct payroll audits to determine whether defendant is accurately reporting and remitting contributions. Loscalzo Decl. ¶ 16 (citing CBA Art. XII).

Contributions become delinquent one day after the date they are due." Counter 56.1 ¶ 20. Under the Collection Policy and the CBA, if defendant fails to timely make contributions, defendant is liable to the Funds for (1) the delinquent contributions, (2) interest at the rate of ten percent (10%) per year calculated from the due date, and (3) liquidated damages of ten percent (10%) of the amount of delinquent contributions owed. Counter 56.1 ¶ 22. If legal action is commenced, defendant is liable for all related costs including, but not limited to, reasonable audit and accounting expenses, witness costs and attorneys' fees, disbursements, and court costs. Counter 56.1 ¶ 22.

## II. The Original Audit and Revised Audits

In 2024, the Funds retained Castiglia, LLP ("Castiglia") to conduct an audit of defendant's books and records for the period of October 1, 2021, through March 31, 2023. Counter 56.1 ¶ 23. Castiglia issued an audit report ("Original Audit"), which revealed

delinquent contributions, union assessments, and dues check-offs. Counter 56.1 ¶ 24. The Original Audit revealed that defendant owed the Funds the sum of $210,529.70 consisting of: (1) delinquent contributions of $195,910.10, (2) union assessments of $9,137.25, and (3) dues check-offs of $5,482.35. *See* Castiglia Decl. Ex. L (Original Audit Report), ECF No. 32-16; Simone Decl. ¶ 25, ECF No. 33-2.

On May 1, 2024, plaintiffs filed the instant lawsuit. *See* Compl. 1. Later in May 2024, defendant submitted contributions of $38,685.68 to the Funds for the period of June 18, 2022, through January 28, 2023, beyond their due dates. Counter 56.1 ¶ 37; *see* Montelle Decl. Ex. H (Payments for June 18, 2022 to Jan. 28, 2023), ECF No. 32-11; Simone Decl. ¶¶ 19–20. Again in 2024, defendant made late-paid contributions to the Funds for the period of December 2023 through May 2024 beyond their due dates. Counter 56.1 ¶ 41; *see* Simone Decl. ¶ 21. Both prior to and during the pendency of the instant action, defendant made contributions for the period of October 2021 through December 2023. Counter 56.1 ¶ 44; *see* Morris Decl. Ex. O ("LPI Report") (purple highlighted entries), ECF No. 32-20.

In March 2025, a revised audit was issued to remove findings based on satisfactory payment made by defendant's general contractors and to remove findings related to a project referred to as "Red Rock." Counter 56.1 ¶ 25; *see* Castiglia Decl. Ex. M ("First Revised Audit") at 2–3, ECF No. 32-17. The First Revised Audit revealed that defendant owed the Funds the sum of $152,904.84 consisting of: (1) delinquent contributions of $142,265.03, (2) union assessments of $6,649.88, and (3) dues check-offs of $3,989.93.

Counter 56.1 ¶ 26.[5] In June 2025, defendant remitted payments totaling $99,109.48 towards the First Revised Audit. Counter 56.1 ¶ 28; *see* Simone Decl. ¶ 22.

In July 2025, a second revised audit was issued to account for payments made by defendant for the period of November 13, 2021, through March 25, 2023. Counter 56.1 ¶ 29; *see* Castiglia Decl. Ex. N ("Second Revised Audit" or "Audit"), ECF No. 32-18. The Second Revised Audit revealed that defendant owed the Funds a sum of $46,089.29 consisting of: (1) delinquent contributions of $42,833.08, (2) union assessments of $2,035.13, and (3) dues check-offs of $1,221.08. Counter 56.1 ¶¶ 29–30.[6]

Pursuant to the CBA and the Collection policy, defendant owes contributions, interest, late payment interest on the late-paid contributions, and liquidated damages. *See* Counter 56.1 ¶¶ 38–39, 43–44, 46.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021).[7] Facts are in genuine dispute when "the jury could

---

5 While defendant challenges the accuracy of the findings in the First Revised Audit, defendant does not challenge that this audit report reflected that the amount was owed. *See* Counter 56.1 ¶ 26; Simone Decl. 28.

6 While defendant challenges the accuracy of the findings in the Second Revised Audit, defendant does not challenge that this audit report reflected the amount was owed. *See* Counter 56.1 ¶ 30; Simone Decl. ¶ 30.

7 Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

reasonably find for" the non-moving party based on the evidence in the record. *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).

On review of a Rule 56 motion, the Court "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Brandon v. Royce*, 102 F.4th 47, 54 (2d Cir. 2024). The movant "bears the initial burden of showing that there is no genuine dispute as to a material fact." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). Where the moving party meets their burden, the non-moving party must provide sufficient evidence establishing a genuine issue of material fact beyond "[t]he mere existence of a scintilla of evidence." *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012). The court need only consider admissible evidence and is not obligated to conduct an independent review of the record to identify a factual dispute. *Looney v. Macy's Inc.*, 588 F. Supp. 3d 328, 340 (E.D.N.Y. 2021).

A district court's role is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022). Furthermore, "a district court may not make credibility determinations, or weigh evidence" on summary judgment. *Reynolds v. Quiros*, 990 F.3d 286, 294 (2d Cir. 2021). Thus, a district court denies summary judgment where there are disputed facts "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Davis-Garett v. Urb. Outfitters*, Inc., 921 F.3d 30, 45 (2d Cir. 2019).

## DISCUSSION

Plaintiffs argue that they are entitled to summary judgment because defendant violated Section 515 of ERISA by failing to pay contributions, interest, liquidated damages, union assessments, and dues check-offs. Further, plaintiffs contend defendant's

failure to make payments as required under Section 515 of ERISA is a breach of the CBA in violation of Section 301 of the LMRA. Plaintiffs assert that defendant's actions entitle them to these payments as well as attorneys' fees and costs, audit costs, and post-judgment interest pursuant to Section 502 of ERISA.

## I. ERISA and the LMRA

Section 515 of ERISA provides that an employer obligated to make contributions to a multiemployer plan under the terms of a collective bargaining agreement "shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of . . . such agreement." 29 U.S.C. § 1145. To prove liability under Section 515, a plaintiff must show that defendant (1) is an employer within the meaning of ERISA, (2) has contribution obligations that arise from either a plan or a collective bargaining agreement, and (3) failed to make those contributions. 29 U.S.C. § 1145; *see Div. 1181 Amalgamated Transit Union-New York Emps. Pension Fund v. New York City Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021).

The LMRA authorizes suits in federal court for "violation[s] of contracts between an employer and a labor organization representing employees." 29 U.S.C. § 185(a). Under this section, "an employer may be held liable for failing to remit dues or make contributions to a labor organization as required by a CBA." *Bricklayers Ins. & Welfare Fund v. P.P.L. Constr. Servs. Corp.*, No. 12-cv-03940, 2017 WL 9481016, at *10 (E.D.N.Y. Jan. 12, 2017).

ERISA further requires an employer to maintain accurate records of an employee's work "sufficient to determine the benefits due or which may become due." 29 U.S.C. § 1059(a)(1). *See Cement & Concrete Workers Dist. Council Welfare Fund v. Superior Gunite*, 742 F. Supp. 3d 309, 315 (E.D.N.Y. 2024). "Since the employer is in the best

position to know the number of hours worked, courts have determined that the policies of ERISA are advanced by the imposition of a burden that reflects the employer's duties under ERISA." *Demolition Workers Union v. Mackroyce Contracting Corp.,* No. 97-cv-04094, 2000 WL 297244, at *7 (S.D.N.Y. Mar. 22, 2000).

District courts in the Second Circuit use a modified summary judgment burden-shifting framework when parties dispute the contributions owed due to the employer's failure to keep ERISA records. *Cement & Concrete Workers Dist. Council Welfare Fund*, 742 F. Supp. 3d at 315. Under this framework, the Funds may meet their prima facie burden by "producing evidence that raises genuine questions about the accuracy of the employer's records and the number of hours actually worked." *Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of Int'l Union of Operating Eng'rs, Loc. 15, 15A, 15C & 15D, AFL-CIO v. Eastport Excavation & Utilities Inc.*, 3 F. Supp. 3d 204, 215 (S.D.N.Y. 2014). "Courts may rely on an audit or an auditor's report to prove that defendant employers did not make required contributions to funds." *Trs. of Local 813 Ins. Tr. Fund v. Rogan Bros. Sanitation Inc.*, No. 12-cv-06249, 2018 WL 1587058, at *5 (S.D.N.Y. Mar. 28, 2018).

The burden then shifts to the employer "to come forward with evidence either of the precise number of hours worked or to negate the reasonableness of the inferences to be drawn from the plaintiff fund's evidence." *Mason Tenders Dist. Council Welfare Fund v. LJC Dismantling Corp.*, 400 F. Supp. 3d 7, 20 (S.D.N.Y. 2019); *see Trs. of Local 813 Ins. Tr. Fund*, 2018 WL 1587058, at *11 (placing the burden on the employer "to come forth with evidence challenging the amount produced by the audit"). "Courts award ERISA benefit plans contributions based on their audit unless the employer can raise a genuine issue of material fact as to the accuracy of the calculations made" in the audit.

*Bd. of Trs. of Am. Fed'n of Musicians & Emps.' Pension Fund v. Banos*, No. 18-cv-04250, 2019 WL 2477316, at *4 (S.D.N.Y. May 24, 2019), *report and recommendation adopted as modified*, 2019 WL 2473452 (S.D.N.Y. June 13, 2019).

## II. Plaintiffs' Prima Facie Burden

Here, there is no dispute that defendant is an employer within the meaning of ERISA. The parties agree that pursuant to the CBA, defendant is obligated to remit contributions for all hours of covered work beginning on the effective date of the agreement. CBA art. IX § 1; Counter 56.1 ¶ 10. Additionally, the parties agree that the Side Letter modifies the CBA to limit all covered work to projects "funded in whole or in part by any City, State or Federal municipality and/or agency." Side Letter 1; *see* Counter 56.1 ¶ 8.

As described above, Castiglia conducted an audit of defendant's records between October 1, 2021, and March 31, 2023, which revealed deficiencies in the contributions remitted to the Funds. *See Loc. 282 Welfare Tr. Fund v. A. Morrison Trucking, Inc.*, No. cv-92-02076, 1993 WL 120081, at *1 (E.D.N.Y. Mar. 30, 1993) ("[T]he Funds must establish a prima facie case by demonstrating the inaccuracy of the employer's contributions."). Further, defendant acknowledges that it did not make timely contributions. *See* Counter 56.1 ¶¶ 44, 46. Indeed, the Original Audit was revised to account for subsequent contributions defendant made towards deficiencies that it identified. Counter 56.1 ¶¶ 28–29.

Accordingly, plaintiffs have made a prima facie case that defendant breached its obligation under the CBA and thereby violated Section 515 of ERISA and Section 301 of the LMRA.

## III. Defendant's Breach of the CBA

To avoid summary judgment, defendant must "produce evidence showing the precise number of hours worked or negating the reasonableness of the plaintiff's evidence." *Superior Gunite*, 742 F. Supp. 3d at 315. The parties do not dispute that defendant failed to remit payments under the CBA to plaintiffs. However, the parties disagree on the extent of defendant's obligations. Plaintiffs argue that defendant failed to pay $183,522.04 in contributions, union assessments, dues check-offs, interest, liquidated damages, attorneys' fees and costs. Mot. 7. Defendant contests its obligation to pay $104,617.13 of the $183,522.04 that plaintiffs seek on two grounds. *See* Counter 56.1 ¶ 48; Opp'n 24–25. First, defendant argues it is not liable for contributions prior to the signing of the CBA. Opp'n 24. Second, defendant asserts it is not liable for contributions on work not covered by the CBA. Opp'n 25. To prevail at summary judgment, the Funds must show that the CBA imposes a clear obligation on defendant and there is no dispute of fact as to any inconsistency or inaccuracy in the Audit.

### A. *Liability for Pre-August 17, 2022 Contributions*

Defendant argues that its obligation to remit contributions and make payments began on the day the CBA was executed, August 17, 2022, and therefore, defendant should not be liable for contributions prior to that date. Opp'n 24–25.[8] Specifically, defendant

---

[8] Defendant incorrectly frames this argument as an issue of the Court's subject matter jurisdiction. Subject matter jurisdiction was properly invoked in plaintiff's complaint as this case arises under federal statute—Section 502(e) of ERISA and Section 301 of the LMRA. Under Second Circuit precedent, the district court is vested with jurisdiction over such claims. *See Trs. of New York State Nurses Ass'n Pension Plan v. White Oak Glob. Advisors, LLC*, 102 F.4th 572, 602 (2d Cir. 2024) (discussing that Section 502(e) of ERISA and Section 301 of the LMRA confer jurisdiction to district courts to enforce plan terms or documents). Defendant's argument here is a defense, "relevant only to whether [plaintiffs] can make out a successful claim for relief, and not to whether the court has original jurisdiction over the claim itself." *Burke v. Lash Work*

contests that it is not liable for payments between the period of October 1, 2021 (the beginning of the audit period) and August 16, 2022 (the date prior to signing the CBA). The Funds counter that defendant is liable for pre-August 17, 2022, contributions covered by the Audit. Reply 7. The Court agrees.

Collective bargaining agreements under ERISA are construed "according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 179 (2d Cir. 2019) (quoting *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015)). Where the language of a contract is "clear and unambiguous," its meaning must be construed consistent with "its plainly expressed intent." *M&G Polymers*, 574 U.S. at 435. "Where the parties dispute the meaning of particular contract clauses, the task of the court is to determine whether such clauses are ambiguous when read in the context of the entire agreement." *32BJ N. Pension Fund v. Nutrition Mgmt. Servs. Co.*, 935 F.3d 93, 100 (2d Cir. 2019) (concluding that the employer's obligation to pay interest on delinquent contributions commenced on the effective date of the agreement between the employer and the union).

Applying these principles to the CBA—the validity of which defendant does not dispute—it is "clear and unambiguous" that the CBA's effective date was July 1, 2021. *M&G Polymers*, 574 U.S. at 435. This is evident from the express language of the CBA. The last page of the CBA states the agreement is "effective as of the day and year above written." CBA 41. The dates listed above are "July 1, 2021 through June 30, 2024." This

---

*Environments, Inc.*, 408 F. App'x 438, 440 (2d Cir. Jan. 31, 2011) (summary order) (quoting *S. New Eng. Tel. Co. v. Global NAPs Inc.,* 624 F.3d 123, 132 (2d Cir. 2010); and then citing *Carlson v. Principal Fin. Grp.,* 320 F.3d 301, 306–07 (2d Cir. 2003) (applying this standard to the ERISA context)).

page is signed by defendant's representative and the Union and dated August 17, 2022. CBA 41.

This conclusion is also supported by other terms of the CBA referencing the effective date of July 1, 2021. For example, the CBA lists the wages for certain job classifications and apprentices starting on July 1, 2021, CBA art. VII § 8, art. XIV § 7, art. XV § 2, as well as contribution amounts for various fringe benefits funds for the years 2021, 2022, and 2023, CBA art. IX § 1(b). *See Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 132 (2d Cir. 2005) ("[W]e must . . . avoid rendering any of the CBA language superfluous."). Moreover, the subject line of the Side Letter (which was executed on the same day as the CBA)—"Side Letter to the Independent Collective Bargaining Agreement Between Laborers' Local Union 1010 and Tri-State Paving LLC for the period of July 1, 2021 through June 30, 2024"—further demonstrates that the parties understood the CBA's effective period to run from July 1, 2021 through June 30, 2024.

Defendant's argument about the CBA's effective date not only runs contrary to the CBA's terms, but it is also inconsistent with defendant's own conduct. Defendant admits that on at least three occasions it made contributions covering the period before August 17, 2022. *See* Counter 56.1 ¶¶ 29 (contributions for the period of November 13, 2021 through March 25, 2023), 37 (contributions for the period of June 18, 2022 through January 28, 2023), 44 (contributions for the period October 2021 through December 2023). And defendant does not dispute that at least some of the contributions it paid for the period prior to August 17, 2022, were late. For example, defendant admits that the contributions it paid for the period of June 18, 2022 through January 28, 2023, in the amount of $38,685.68, were late. Counter 56.1 ¶ 37. Contrary to defendant's argument, this is not a case in which the employer "discontinued making payments" or "made clear

that it did not agree with the [CBA][], and never signed the [CBA]." *King v. Atlas Transit Mix Corp.*, Nos. 95-cv-01098, 95-cv-01511, 1999 WL 1288943, at *1–2 (E.D.N.Y. Oct. 22, 1999); *see* Opp'n 24. Indeed, it is difficult to understand why defendant would have made contributions prior to August 17, 2022 if it believed that it did not owe contributions for that time period. *See Brown v. C. Volante Corp.*, 194 F.3d 351, 353, 355–56 (2d Cir. 1999) (finding employers manifested intent to adopt the collective bargaining agreement even though the agreement was unsigned because employer acknowledged, in writing, its payment responsibility, made contributions, and cooperated in an audit of its own records); *see also Cement and Concrete Workers Dist. Council Welfare Fund v. Manny P Concrete Co*, No. 19-cv-02145, 2023 WL 3948751, at *8 (E.D.N.Y. June 12, 2023) (finding the employer admitted liability under ERISA and LMRA by conceding to the accuracy of the audit's findings).

In support of its argument that it was not bound before August 17, 2022, defendant offers eight employee affidavits. Each employee states a belief that the work they performed prior to August 17, 2022, was not covered by the CBA. *See* Amilcar Amaya Decl. ¶¶ 6–13, ECF No. 33-3; Roberto Bonilla Decl. ¶ 6, ECF No. 33-4; Carlos Cruz Decl. ¶¶ 8–9, ECF No. 33-5; Pedro Alves de Oliveira Decl. ¶¶ 8–9, 11, ECF No. 33-6; Victor Martinez Decl. ¶¶ 6–8, ECF No. 33-9; Isaias Ortiz Decl. ¶ 6, ECF No. 33-10; Ronis Rivera Decl. ¶¶ 6–7, ECF No. 33-12; Luis Romero Decl. ¶¶ 8–11, ECF No. 33-13.

These affidavits are of no help to defendant because an employee's belief—in this case, a mistaken one—about the scope of a contract is insufficient to create a material issue of fact where the clear, unambiguous, and undisputed language of the contract

dictates that precise point.[9] Put another way, the fact that these employees believed that their work prior to a certain period wasn't covered by the CBA is irrelevant because the CBA expressly states the scope of its coverage—from "July 1, 2021 through June 30, 2024." CBA 41.

The effective date of the CBA is a matter of contract interpretation. Defendant does not point to any provision of the CBA, Side Letter, or any other agreement incorporated into the CBA to support its claim that the CBA was in effect beginning on August 17, 2022. Moreover, defendant's payment of contributions prior to August 17, 2022 (including its admission that at least some of those contributions were paid late) manifests its intent to be bound by the terms of the CBA during the relevant period. The express terms of the CBA and Side Letter, as well as defendant's own conduct, make clear that defendant was obligated to make contributions for the period prior to August 17, 2022. Accordingly, defendant is obligated to make contributions and other payments covering the period prior to August 17, 2022, including the contested period of October 1, 2021 through August 16, 2022.

---

9 For summary judgment purposes, an affidavit in support or in opposition, "including those made for the purposes of the motion only" must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(1), (4). "[U]ltimate or conclusory facts and conclusions of law" will not suffice. *BellSouth Telecomm., Inc. v. Grace & Co.,* 77 F.3d 603, 615 (2d Cir. 1996). While the dates an employee worked, their roles, and hours would be within an employee's personal knowledge, that is not so clear with the effective date. Neither the affiants nor the defendant "allege facts (let alone provide evidence) that might have given" those statements some basis. *Hubbs v. Suffolk Cnty. Sheriff's Dep't,* 788 F.3d 54, 60 (2d Cir. 2015). The affidavits are thus conclusory on this point. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993) (explaining that at the summary judgment stage, a nonmoving party "may not rely simply on conclusory statements"). The affidavits do not state how the employees came to believe that work they performed prior to August 17, 2022, was not covered by the CBA. Put another way, the affidavits do not show how the effective date of the CBA came within their personal knowledge.

*B. Work Covered by the CBA*

Next, defendant challenges the Audit's findings. Specifically, defendant argues that it is not required to make contributions for work not covered by the CBA but nevertheless included in the Audit. Opp'n 25. Defendant identifies two categories of non-covered work: (1) work performed by truck drivers, non-working foremen or supervisors, and operators of heavy equipment; and (2) work on privately funded construction projects. Opp'n 6, 25.

With respect to the first category, plaintiffs agree that operating heavy equipment is not covered by the CBA and explain that the Audit's methodology excluded the hours documented on timecards that were performed by operators of heavy equipment. Reply 10; *see* Iorfino Decl Ex. Y (Castiglia Email), ECF No. 34-2. Plaintiffs contend, however, that truck drivers, non-working foremen, and non-working supervisors are job classifications covered by the CBA. Reply 10.

With respect to the second category, plaintiffs agree that defendant is not obligated to make contributions on private construction work, but contend that defendant failed to provide any evidence that the projects it claims are private construction work were in fact privately funded. Reply 11. The Court takes up each category in turn.

i. Work performed by truck drivers, non-working foremen or supervisors, and operators of heavy equipment

First, the Court finds that defendant has raised a triable issue of fact as to whether the work performed by specific employees was covered by the CBA. Defendant argues that the Audit erroneously calculated hours worked by Tri-State Paving employees as truck drivers, non-working foremen, non-working supervisors, and operators of heavy equipment because these job classifications are not covered by the CBA. Opp'n 4–5.

Alternatively, defendant argues that the text of the CBA is ambiguous on the question of whether these job classifications are covered by the CBA. Opp'n 5.

To support its arguments, defendant relies on affidavits from Tri-State Paving employees. *See* Amaya Decl. ¶¶ 14–15; Cruz Decl. ¶¶ 6–7; Alves de Oliveira Decl. ¶¶ 6–7, 10; Juan Guevara Decl. ¶¶ 6–12, ECF No. 33-7; Raza Mahmood Decl. ¶¶ 6–9, ECF No. 33-8; Ortiz Decl. ¶ 7; Estanislao Peralta Decl. ¶ 6, ECF No. 33-11; Romero Decl. ¶¶ 6–7; Tomas Reis Decl. ¶¶ 6–8, ECF No. 33-14; *see also* Simone Decl. ¶¶ 89–93 (discussing Felipe Ferreira's hours employed as a truck driver), 105 (discussing Eduard Minoso Baez's hours employed as a truck driver), 126 (discussing Ramon Amaya's hours employed as a truck driver), 151–53 (discussing employee Muhammad A. Aslam's work as an assistant project manager), 181–82 (discussing Maximilian Beres' work as a non-working supervisor).[10] Each affidavit states the specific projects, job classifications, and dates and hours worked. For example, Mr. Guevara states: "During the time period for the week ending October 16, 2021, I was employed by Tri-State Paving as a non-working supervisor/foreman at a project for Ansu Construction Inc. at Benjamin Cardozo – Athletic Field for sixteen (16) hours." Guevara Decl. ¶ 7. Other employees make substantially similar statements with respect to work they performed as truck drivers. *See*, *e.g.*, Cruz Decl. ¶ 7. Employees also make the same statements with respect to their work as an operating engineer. *See*, *e.g.*, Amaya Decl. ¶ 14. Defendant asserts operating engineering work entails the operation of

[10] Defendant's Opposition argues that employees Robert Bonilla, Victor Martinez, Vincenzo Pezzino, and Ronis Rivera also performed work as truck drivers, nonworking foremen and supervisors, and/or operators of heavy of equipment. Opp'n 23. However, a review of these employees' affidavits shows that these employees do not state that they performed the aforementioned work. *See* Bonilla Decl.; Martinez Decl.; Simone Decl. ¶¶ 97–102; Rivera Decl. Thus, Bonilla, Martinez, Pezzino, and Rivera are excluded from the list.

heavy machinery. Girolamo Decl. ¶ 14, ECF No. 33-15. The parties agree that operating heavy machinery is not covered by the CBA, Reply 10, and plaintiffs contend that this work was excluded from the Audit. However, defendant asserts that operating engineers who also operate heavy machinery were erroneously included in the Audit, Opp'n 9, 11–13, 17–18.

Plaintiffs ask the Court to set aside the affidavits altogether. Plaintiffs assert defendant failed to maintain employee records that the Funds may review and accurately determine whether benefits are due. Plaintiffs argue defendant's attempt to obfuscate that duty by relying on "vague employee recollections to contradict . . . deficient records" should be rejected. Reply 9.

The Court will credit the parts of the affidavits that are based on personal knowledge, such as the employees' role, dates and hours of employment, and project assignments.[11] *See Pineda*, 831 F. Supp. 2d at 681 (crediting employees affidavits on the wages they received and hours they worked as being within the personal knowledge of the employees); *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 138 (2d Cir. 2009) (finding affidavit from former vice president of defendant's company raised a triable issue of fact because he was "fully familiar with the facts and circumstances" surrounding the debt owed by the company).

---

[11] The affidavits also state in a conclusory manner that to the employees' "knowledge . . . the work that [each employee] performed was not Covered Work under the Local 1010 CBA with Tri-State Paving" and that "[w]ith respect to the[se] . . . hours . . ., [the employee is] not entitled to and should not have benefit contributions paid by Tri-State Paving to the Funds on [their] behalf[.]" *See, e.g.*, Amaya Decl. ¶ 14. To the extent that the employee affidavits make claims about the meaning of the CBA without asserting the basis for that interpretation, the Court finds those statements are not based on personal knowledge and does not credit them. *See Pineda*, 831 F. Supp. 2d at 681 ("A court may . . . simply decline to consider those aspects of a supporting affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible.").

However, neither party offers clear evidence on the nature and context of the duties of a truck driver, non-working supervisors, or non-working foremen to establish whether the duties performed by the employees who worked in these roles are covered by or excluded from the CBA. Plaintiffs point the Court to catchall language in the CBA, claiming that the CBA's plain language is "not limited to" the work listed. Reply 10; CBA art. VI § 1. That language, however, is not enough to render the CBA unambiguous.

The CBA provides that it covers all site and grounds improvement, including but not limited to utility, paving, highway, road and street construction work. CBA art. VI § 1. The CBA enumerates the duties it covers; for example, the CBA covers "pouring and finishing of steel and concrete curb[;] . . . preparation and paining of the steel face curb at punch list time[; and] . . . placement of all asphalt curbs, and concrete curbs when a concrete paver is used on the jobsite." CBA art. VI § 1 ¶¶ 9–11. The CBA also lists certain job classifications it covers. CBA art. VII § 8. However, neither the duties nor the job classifications include truck driving/drivers, and non-working supervising/supervisors, and plaintiffs have not presented the Court with a basis to conclude as a matter of law that the catchall provision includes those positions. While the CBA expressly mentions foremen are a covered job classification and distinguishes between foremen working in the "production paving" and those that are not, CBA art. VII, § 8, the CBA does not make clear whether a "non-working" foreman is included in the foreman job classification. Accordingly, there are triable issues whether truck driving, non-working supervisors, and non-working foremen are covered work under the CBA.

Further, while the parties agree that the operators of heavy equipment are not covered by the CBA, the parties dispute whether this role was erroneously counted in the Audit. For example, Mr. Alves de Oliveira states that he worked as an operating engineer

for eight hours on November 13, 2021. Alves de Oliveira Decl. ¶ 7. However, the Audit included the eight hours Mr. Alves de Oliveira worked on November 13, 2021. Second Revised Audit 11. Plaintiffs have not presented evidence to establish that Mr. Alves de Oliveira's duties on November 13, 2021, included work covered by the CBA. Nor have plaintiffs provided evidence indicating that operating engineers do not operate heavy machinery and are therefore covered by the CBA. Thus, there also remains a triable issue as to whether operating engineers whose hours were accounted for in the Audit operated heavy equipment and were erroneously counted in the Audit.

Accordingly, plaintiffs' motion is denied as to certain hours worked by Amilcar Amaya, Ramon Amaya, Cruz, Alves de Oliveira, Guevara, Baez, Ferreira, Mahmood, Ortiz, Peralta, Romero, Reis, Aslam, and Beres as there remain triable issues as to whether these employees were performing work covered by the CBA during those hours.

ii. Work on privately funded construction projects

The second category of work defendant contends is not covered by the CBA is work done on privately funded projects. According to the Side Letter, the CBA only covers projects that are "funded in whole or in part by any City, State or Federal municipality and/or agency," that is, publicly funded projects. Side Letter 1. Defendant argues that certain construction projects are not covered by the CBA because those projects were not funded at least in part by public funds. Opp'n 6. Plaintiffs argue that the failure to maintain accurate records concerning the funding source for construction projects is entirely on defendant, and that defendant offers no evidence to prove that the projects on which its employees worked were privately funded. Reply 11.

Defendant's argument, based on conclusory statements in employee affidavits, is wholly unsupported. *E.Z. Save, Inc. v. Getty Petroleum Corp.*, 46 F. App'x 55, 56 (2d Cir.

2002) (summary order) ("Reliance upon conclusory statements or unsupported allegations is not sufficient to defeat summary judgment."). For example, Ms. Amaya, Mr. Martinez, Mr. Alves de Oliveira, Mr. Ortiz, Mr. Rivera, and Mr. Romero each state: "I was employed by Tri-State Paving as a prevailing wage laborer (all wages and supplemental benefits were in my pay envelope) at a project for Corbex Inc. at Brooklyn College[.] . . . It is . . . my understanding that this project was not covered by [the CBA]." Amaya Decl. ¶¶ 6, 8–13; Martinez Decl. ¶¶ 6–8; Alves de Oliveira Decl. ¶¶ 11–12; Ortiz Decl. ¶ 6; Rivera Decl. ¶¶ 6–7; Romero Decl. ¶¶ 8–11. The employees' affidavits also state that other projects were "not covered by the CBA." *See* Amaya Decl. ¶ 7 (Earth Group at PS 181); Alves de Oliveira ¶¶ 8–9 (Forte Construction Corp. at PS 39). These statements are entirely conclusory. The funding source for a construction project is the kind of information that would uniquely be in the hands of an employer. Defendant fails to provide any admissible evidence showing that the construction projects were privately funded. *See generally* Simone Decl.; Girolamo Decl. Thus, there is no dispute that the projects at Corbex Inc. at Brooklyn College, Earth Group at PS 181, or any other projects identified by the employees are covered by the CBA.

* * *

Accordingly, there is no triable issue of material fact that the effective date of the contract, July 1, 2021, includes the period covered by the Audit—October 1, 2021 through March 25, 2023. There is also no dispute that the projects are covered by the CBA. There are, however, triable issues whether truck driving, non-working foremen and supervisors, and operators of heavy equipment are covered work pursuant to the CBA, and thus should be accounted in the Audit.

## IV. Damages

Plaintiffs who have established liability under Section 515 of ERISA are entitled to an award of: "(1) the amount of unpaid contributions, (2) interest on the unpaid contributions, (3) liquidated damages, (4) reasonable attorneys' fees and costs, and (5) such other legal or equitable relief as the court deems appropriate." *Lanzafame v. Toquir Contracting, Inc.*, 545 F. Supp. 2d 255, 259 (E.D.N.Y. 2007) (citing 29 U.S.C. § 1132(g)).

Here, plaintiffs claim defendant owes a total of $183,522.04 consisting of:

(1) $79,621.10 in delinquent contributions, interest thereon, liquidated damages, union assessments, dues check-offs, and audit costs, Mot. 6–7;

(2) $24,996.03 in attorneys' fees and costs, Mot. 7;

(3) post-judgment interest calculated at the statutory rate provided in 28 U.S.C. § 1961, Mot. 20;

(4) $65,610.30[12] in interest on late-paid contributions, *see* Mot. 7; and,

(5) $13,294.61[13] in liquidated damages on late-paid contributions, *see* Mot. 7.

The Court denies summary judgment on plaintiff's request for $79,621.10 in delinquent contributions, interest thereon, liquidated damages, union assessments, dues check-offs, and audit costs, and $24,996.03 in attorneys' fees and costs, all of which may be impacted by the remaining issues of triable fact. The Court also declines granting post-judgment interest as no final judgment has been entered in this case.

---

12 This figure is the sum of: $6,882.51 for the period June 18, 2022 through January 28, 2023; $3,020.63 for the period December 2023 through May 2024; $32,094.95 for the period October 2021 through December 2023; and $23,612.21 for the period November 13, 2021 through March 25, 2023.

13 This figure is the sum of: $3,868.57 for the period June 18, 2022 through January 28, 2023; and $9,426.04 for the period December 2023 through May 2024.

Finally, having found defendant is liable under ERISA and the LMRA for pre-August 17, 2022 contributions, *supra* III.*A*., defendant must pay late payment interest and liquidated damages on late-paid contributions.

*A. Late Payment Interest on Late-Paid Contributions*

Both ERISA and the CBA provide for late payment interest on late-paid contributions. Under ERISA, the Funds may recover late payment interest on untimely contributions paid *after* an action is commenced. *Iron Workers Dist. Council of W. New York & Vicinity Welfare & Pension Funds v. Hudson Steel Fabricators & Erectors, Inc.*, 68 F.3d 1502, 1506 (2d Cir. 1995) ("an employer cannot escape its statutory liability for interest, liquidated damages or double interest, attorney fees, and costs simply by paying the delinquent contributions before entry of judgment in a § 1132(g)(2) action brought to recover delinquent contributions."); *see Kilkenny as Tr. Constr. Council Loc. Union 175 Pension Fund v. Flushing Asphalt, LLC*, No. 22-cv-01822, 2024 WL 4333903, at *10 (E.D.N.Y. Sept. 28, 2024) (awarding interest on late-paid contributions made during the lawsuit).

Although ERISA does not entitle plaintiffs to interest on untimely contributions paid *before* an action is commenced, these damages may be recoverable under the LMRA "if the . . . [F]unds . . . provide a contractual basis for such an award." *Finkel v. Robco Elec. Corp.*, No. 11-cv-2353, 2012 WL 3306963, at *6, 2012 (E.D.N.Y. Mar. 30, 2012), *report and recommendation adopted*, 2012 WL 3307631 (E.D.N.Y. Aug. 13, 2012) (awarding interest on late-paid contributions made prior to the commencement of the suit); *Gesualdi v. Fortunata Carting Inc.*, 5 F. Supp. 3d 262, 275–76 (E.D.N.Y. 2014), *report and recommendation adopted*, *Gesualdi*, 5 F. Supp. 3d at 266 (awarding interest for pre-action contributions paid late because the agreement provided for such recovery).

Here, defendant paid contributions for the following periods *after* the suit commenced: November 13, 2021 through March 25, 2023, Counter 56.1 ¶¶ 45–46; June 18, 2022 through January 28, 2023, Counter 56.1 ¶ 37; and December 2023 through May 2024, Counter 56.1 ¶¶ 41–42. Pursuant to ERISA, defendant is liable for late payment interest for these late-paid contributions.

Additionally, for the period covering October 2021 through December 2023, defendant made late-paid contributions both *before* and *after* the commencement of this suit. *See* LPI Report 1.[14] While ERISA provides for the recovery of late payment interest for those late-paid contributions made *after* the instant action commenced, the LMRA provides for recovery for those late-payment contributions made *before* the action commenced because the parties' agreement provides for it, *see* Collection Policy art. II; Counter 56.1 ¶ 17 (admitting the CBA binds defendant to the Collection Policy).

To arrive at the amounts of late payment interest, plaintiffs engaged the services of a third-party administrator, Zenith American Solutions ("Zenith"), who is responsible for monitoring defendant's payment of benefits contributions. Morris Decl. ¶¶ 3, 6. Zenith prepares reports documenting an employer's underpayment, overpayment, and late

---

[14] For example, in the LPI Report, the purple highlighted entries are for contributions covering the period of October 2021 through December 2023. Morris Decl. ¶ 19. The third column from the left is labeled "Cont. Mth" and reflects the month for which contributions were paid late. Morris Decl. ¶ 11. The fifth column from the left is labeled "Receipt Date" and reflects the date when plaintiffs received the contribution payment from defendant. Morris Decl. ¶ 12. Each row in the LPI Report reflects an instance where, due to defendant's late payment, defendant was assessed late payment interest by the Funds pursuant to the Collection Policy, and where defendant has not paid the assessed late payment interest. Morris. Decl. ¶ 14. On page one of the LPI Report, the first row is for contributions for the month of October 2021, which were paid late on February 9, 2022 and prior to this action. *See* LPI Report 1. On page seven of the LPI report, the third row from the top is for contributions for the month of April 2023, which were paid late on September 13, 2024—after the May 1, 2024 date the suit was filed. *See* LPI Report 7.

payment interest accrued by employers when employers pay benefit contributions beyond the due date set forth in the CBA. Morris Decl ¶¶ 7, 10. Zenith produced the LPI Report on late payment interest owed by defendant. The late payment interest is calculated based on the formula set forth in the Collection Policy at the rate of ten percent (10%) per annum from the due date. Morris Decl. ¶ 9; Counter 56.1 ¶¶ 15, 22.

The Court has reviewed plaintiffs' calculations of late payment interest of:

- $32,094.95 for the period of October 2021 through December 2023, Morris Decl. ¶ 19; LPI Report (purple highlighted entries);
- $23,612.21 for the period of November 13, 2021 through March 25, 2023, Morris Decl. ¶ 20; LPI Report (yellow highlighted entries);
- $6,882.51 for the period of June 18, 2022 through January 28, 2023, Morris Decl. ¶ 17; LPI Report (orange highlighted entries); and,
- $3,020.62 for the period December 2023 through May 2024, Morris Decl. ¶ 18; LPI Report (green highlighted entries).

Defendant's sole challenge to plaintiffs' interest calculations is that defendant became bound to the CBA on August 17, 2022, and does not owe any interest on contributions prior to that date. Counter 56.1 ¶¶ 38, 42, 44, 46. As determined above, *supra* III.*A*., defendant was bound to the CBA starting from the CBA's effective date—October 1, 2021. Thus, under ERISA and the CBA, defendant is liable for interest on the contributions it paid late.

The Court has reviewed the accuracy of plaintiffs' calculations and determined that they are correct. Thus, plaintiffs are awarded $65,610.30, the sum of the late payment interest.

*B. Liquidated Damages on Late-Paid Contributions*

Under ERISA, the Funds may also recover liquidated damages on contributions paid after the commencement of an action. 29 U.S.C. § 1132(g)(2)(C); *see Hudson Steel Fabricators & Erectors, Inc.*, 68 F.3d at 1506; *Flushing Asphalt, LLC*, 2024 WL 4333903, at *10 (awarding liquidated damages on late-paid contributions made during the lawsuit). Here, plaintiffs are entitled to liquated damages on late-paid contributions made by defendant after the lawsuit commenced.

To arrive at the amounts for liquidated damages, plaintiffs applied the formula set forth in the Collection Policy. Counter 56.1 ¶ 22 ("Employers shall be liable for . . . liquidated damages of 10 percent (10%) of the amount of delinquent [c]ontributions."). The Court has reviewed plaintiffs' calculations of liquidated damages of:

- $3,868.57 or ten percent of the late-paid contributions for June 18, 2022 through January 28, 2023, Montelle Decl. ¶ 35; and,
- $9,426.06 or ten percent of the late-paid contributions for December 2023 through May 2024, Montelle Decl. ¶ 36.

Defendant does not dispute these amounts. *See* Counter 56.1 ¶¶ 42–43. Nevertheless, the Court has determined that the calculations are correct. Thus, plaintiffs are awarded $13,294.61, the sum of the liquidated damages.

* * *

Accordingly, defendant owes plaintiffs $65,610.30 in late payment interest and $13,294.61 in liquidated damages on defendant's late-paid contributions.

Separately, the Court notes that while defendant disputes the amount it owes in late payment interest, as discussed above, it does not dispute its liability for $78,904.91 in damages. *See* Counter 56.1 ¶ 48 (stating "[d]efendant does not owe the Funds . . . $104,617.13" of the $183,522.04 of what plaintiffs argue is owed). However, defendant has not indicated as to what category of damages this total relates. For example, defendant does not state that this amount addresses unpaid contributions, late payment interest, audit fees, or another category. This value, which defendant concedes it owes, is the same value as the total in late payment interest ($65,610.30) and liquidated damages ($13,294.61) awarded on contributions defendant paid late, or $78,904.91. To avoid any confusion, the Court directs defendant to file a letter clarifying the amount it concedes it owes by explaining how it calculated $78,904.91 in undisputed damages and by including a detailed breakdown of the damage categories contemplated by the uncontested amount.

## CONCLUSION

For the reasons stated above, plaintiffs' motion is **GRANTED in part** as to plaintiffs' claims for violations of ERISA and LMRA during the CBA's effective period, including for covered projects, and the sum of $78,904.91 in late payment interest and liquidated damages on defendant's late-paid contributions. Plaintiffs' motion is **DENIED in part** as to defendant's obligation to make payments for employees whose work is classified as truck drivers, non-working supervisors, non-working foremen, and operating engineers.

On or before August 17, 2026, defendant must file its letter on the $78,904.91 in undisputed damages.

In accordance with the Court's Individual Practice Rule IV.A, the parties shall file a proposed joint pretrial order by September 9, 2026.

**SO ORDERED.**

*/s/Natasha C. Merle*
NATASHA C. MERLE
United States District Judge

Dated: August 10, 2026
Brooklyn, New York